**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**RAMONA V. CUMBIE,**

  **Plaintiff,**

**vs.**         **Case No.  4:11-CV-490-CAS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

  **Defendant.**

_____/


## MEMORANDUM OPINION AND ORDER

  This is a Social Security case referred to the undersigned United States Magistrate Judge upon consent of the parties and reference by District Judge Robert L. Hinkle.  Doc. 7.  _See_ Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the entire Record, the Court affirms the decision of the Commissioner.

## I.  Procedural History of the Case

  On February 14, 2008, Plaintiff, Ramona V. Cumbie, filed a Title II application for a period of disability and Disability Insurance Benefits (DIB), alleging disability beginning January 15, 2001.  R. 9, 101-03.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured, or the date by which her disability must have commenced in order to receive benefits under Title II, is December 31, 2003.  R. 9, 106-07, 131.

Plaintiff's application was denied initially on April 15, 2008, and upon reconsideration on September 24, 2008.  R. 9, 60-67.  On November 19, 2008, Plaintiff filed a request for hearing.  R. 9.  On May 5, 2010, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Stephen C. Calvarese in Tallahassee, Florida.  *Id.* at 22, 24.  Robert C. Bradley, an impartial vocational expert, testified during the hearing.  *Id.* at 24, 44-51, 92 (Resume).  Plaintiff was represented by Alan R. Andrews, an attorney.  *Id.* at 9, 24, 27.

On June 25, 2010, the ALJ issued a Decision denying Plaintiff's application for benefits.  *Id.* at 16-17.  Plaintiff filed a request for review, *id.* at 33, that was denied by the Appeals Council on June 24, 2011.  *Id.* at 1-3.

On September 27, 2011, Plaintiff filed a complaint with the United States District Court seeking review of the ALJ's decision.  Doc. 1.  The parties filed memoranda of law, docs. 11 and 14, and those have been considered.

## II.  Findings of the ALJ

In the written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff "last met the insured status requirements of the Social Security Act on December 31, 2003."  R. 11.

2. Plaintiff has not engaged "in substantial gainful activity during the period from her alleged onset date of January 15, 2001 through her last date insured of December 31, 2003."  *Id.*

3. Through the date last insured, Plaintiff has several severe impairments: "depression and anxiety, NOS vs. post traumatic stress disorder."  *Id.*

4. Through the date last insured, Plaintiff "did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

5. Through the date last insured, Plaintiff "had the residual functional capacity [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations, including moderate restrictions in her ability to: maintain attention and concentration for extended periods; complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. However, she is able to understand and follow instructions, demonstrate a cooperative attitude, make basic work decision [sic], and adapt adequately to work environments. The claimant has some reduction in concentration that would limit her ability to complete complex tasks and she has some reduction in social interaction/stress tolerance that would limit her to work in environments of low social demands." *Id.* at 12.

6. Through the date last insured, Plaintiff "was not unable to perform any past relevant work" as a financial planner. *Id.* at 15.

7. Plaintiff was 49 years old on the date last insured (56 years old as of the administrative hearing, *id.* at 28), has at least a high school education, and is able to communicate in English. *Id.* at 15.

8. Transferability of job skills is not material to the determination of disability. *Id.*

9. Through the date last insured, "considering the [Plaintiff's] age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that the [Plaintiff] could have performed," such as, housekeeper (light, unskilled work), dining room attendant (light, unskilled work), surveillance systems monitor (sedentary, unskilled work), and laminator (sedentary, unskilled work). *Id.* at 15-16.

10. Plaintiff was not under a disability at any time from January 15, 2001, the alleged onset date, through December 31, 2003, the date last insured. *Id.* at 16.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual

findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

 "In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

 A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

Both the "impairment" and the "inability" must be expected to last not less than 12

months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled

to DIB if he is under a disability prior to the expiration of his insured status.  *See*

42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d

1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818

F.2d 96, 97 (1st Cir. 1986).  42 U.S.C. § 423(d)(1)(A)

> quite clearly requires that it is the impairment only which must last for a
> continuous period.  Normally, of course, when a claimant has an impairment
> severe enough to prevent him from working, he will be unable to work for as long
> as the impairment lasts.  This is particularly true when the impairment is physical.
> The statute, however, does not *require* that a claimant be unable to engage in
> work during the entire 12 month period.  *See also* 20 C.F.R. §§ 404.1505(a);
> 404.1509; 404.1510.  The ability of a claimant to engage in work for limited
> periods of time certainly calls into question the severity of the impairment, but it
> does not necessarily determine whether the impairment, however, severe, has
> lasted for at least 12 months.

> While a claimant need only show that an alleged impairment has lasted or can be
> expected to last for the 12 month period to meet the duration requirement, a
> claimant alleging a mental impairment may face a difficulty not presented in
> cases involving physical impairment.  As one court has stated,

>> While the mere existence of symptom-free periods may negate a finding of
>> disability when a physical impairment is alleged, symptom-free intervals
>> do not necessarily compel such a finding when a mental disorder is the
>> basis of the claim.  Unlike a physical impairment, it is extremely difficult to
>> predict the course of mental illness.  Symptom-free intervals, though
>> sometimes indicative of a remission in the mental disorder, are generally
>> of uncertain duration and marked by an impending possibility of relapse.
>> Realistically, a person with a mental impairment may be unable to engage
>> in competitive employment, as his ability to work may be sporadically
>> interrupted by unforeseeable mental setbacks.

> *Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D. Cal. 1981).

> Because of such considerations, the courts which have considered the question
> have concluded that a claimant whose claim is based on a mental condition does
> not have to show a 12 month period of impairment unmarred by any symptom-
> free interval. . . .  We agree with the assessment of these courts.  A finding that a
> claimant has a mental impairment which manifests itself from time to time over a

long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months.". . . . Of course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback. . . .

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted).  *See also*

Lane v. Astrue, No. 1:09CV00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30

(N.D. Fla. July 28, 2010) (citing Singletary).

      The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v):

    1.     Is the individual currently engaged in substantial gainful activity?

    2.     Does the individual have any severe impairments?

    3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

    4.     Does the individual have any impairments which prevent past relevant work?

    5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be

found when the opinion is "not bolstered by the evidence," the evidence "supports a

contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks

persuasive weight," the opinion is "inconsistent with [the treating physician's own

medical records," the statement "contains no [supporting] clinical data or information,"

the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is

not accompanied by objective medical evidence." Lewis, 125 F.3d at 1440; Edwards,

937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

        The opinion of a non-examining physician is entitled to little weight, and, if

contrary to the opinion of a treating physician, is not good cause for disregarding the

opinion of the treating physician, whose opinion generally carries greater weight.  *See*

20 C.F.R. § 404.1527(d)(1); Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985).

A brief and conclusory statement that is not supported by medical evidence, even if

made by a treating physician, is not persuasive evidence of disability.  Johns v. Bowen,

821 F. 2d 551, 555 (11th Cir. 1987).

## IV.  Evidence from the Administrative Hearing

### A.  Ramona Vincent Cumbie (Plaintiff)

        At the beginning of the administrative hearing, the ALJ stated that Plaintiff's last

insured date is December 31, 2003, "so that means you look at [Plaintiff's] condition

between January 15th of '01 and the end of December of '03.  So it's about a two year

time period there."  R. at 24.  The ALJ identified various exhibits and, without objection

from Plaintiff's counsel, the exhibits were received into evidence and made part of the

record and the record was deemed complete.  *Id.* at 25-26.

Ms. Cumbie resides in Tallahassee, Florida.  *Id.* at 28.  She had "some college" but received a certified financial planner designation, a two-year program, from LSU in New Orleans.  *Id.* at 29, 143.  (A December 31, 2002, admission patient note from TMBHC indicates that Ms. Cumbie graduated from LSU and has a master's degree, *id.* at 200, although there are no facts that corroborate this statement.)

Ms. Cumbie was last employed in or around March 2001 performing financial planning for clients, having done such work since 1983-1984.  *Id.*; see *id.* at 137 (1989-2001), 145 (same), 153 (1986-2001).  This was her only job during the past 15 years. She would meet with clients at her office, determine their background and goals, and complete a plan, making recommendations for securities and savings.  *Id.* at 29-30.  Her job required her to use computers and perform research.  *Id.* at 30.  In an eight hour day, she would stand for approximately an hour or two hours, but mostly she was sitting at a computer or meeting with clients.  *Id.*  When meeting with clients, she took notes and input the information into the computer, to generate programs.  *Id.* at 31.  Normally, she had assistants who would pull files.  It was a rare occasion when she had to pull a file out of a cabinet drawer.  *Id.* at 30-31; *see id.* at 154.

Ms. Cumbie testified that in or around 2001, "everything was going really good. [She] had amassed a lot of fortune from [her] clients and the market went down and people didn't really understand the market going down because, you know -- and so then they started contacting lawyers -- at first it was complaints and then it was like apparently two people went to the same lawyer and they really thought they had a case and they basically took December statements from 2000 and looked and thought that I had stolen money."  *Id.* at 31-32.  Ms. Cumbie described being sued (she "won three in

a row") and arrested in June 2001, but not charged.  Before the end of six months, she

was charged with grand theft, arrested, and when that prosecution was not successful,

she was charged, for over four years, with "136 different offences."  *Id.* at 32.  She spent

"three years fighting a total of 16 clients."  During this time period, Ms. Cumbie worked

with three firms and when the client sued her they also sued these firms and, in turn,

she was countersued for their damages.  *Id.*  Overall, she was involved in 16 civil

lawsuits and responded to the criminal charges.  *Id.* at 33.

 In 2002, and at the time Ms. Cumbie was involved in the middle of "small suites

[sic]," she overdosed at a hospital and tried to take her life.  *Id.*  Prior to this attempt,

Ms. Cumbie had been treated by Dr. Morgan who prescribed medication until she could

receive care from Dr. Manasafi, a treating psychiatrist, who treated her "right after [her]

suicide" attempt in 2002 until about a year later in 2003.  *Id.* at 33-34.  Prior to her

suicide attempt, Plaintiff felt "things escalated" and she felt she could not "go on

anymore before" she met with Dr. Munasifi.  *Id.*  In 2004, she had a follow-up suicide

attempt, but none thereafter.  *Id.* at 34.  Ms. Cumbie was asked whether she was having

any problems staying focused and concentrating in and around the time of her "suicide

attempt period in 2003 [sic] [December 2002]" and she responded that she thought she

probably had Alzheimer's with memory lapses such as going to the garage to get

something and while in the garage, forgetting why she went to the garage initially.  *Id.* at

35.

 From 2001 to 2003, Ms. Cumbie did not take any new classes or pursue an

advanced degree.  *Id.  S*he tried to attend Bible study in 2004 after the second

attempted suicide, and also go out socially with her husband, but it was too much for

her.  She had panic attacks and nightmares so she primarily did not want to leave the house.  *Id.* at 36, 41.  She does not leave the house now except maybe once a month, but she always chooses times when she will not see anyone.  She has a driver's license and is still capable of driving, but does not drive much (probably once every three months) because she does not have the same confidence she once had.  Her husband mostly drives.  She lives in town so she can walk down the street.  *Id.*  When she has to drive, she drives to the grocery store early in the morning "[b]ut mostly [she does not] drive."  *Id.* at 36-37.

Ms. Cumbie also explained how she felt during the 2001-2003 time frame.  *Id.* at 37-38.  She would go through periods when she would meet somebody that she knew and she felt the need to discuss her cases with them because she was never allowed to defend herself because the cases never went to court, but the discussions would scare them.  *Id.* at 37.  During this time frame, she was on a lot of medication and sleeping a lot.  There was a point when she had to go to court and she had to stop taking her medicine and the off and on situation regarding her medicines would disturb her.  *Id.* at 38.  Her mood would fluctuate.  *Id.*  For example, she would have a difficult episode and then come home and take medicine which caused her not to want to go out anymore. *Id.* at 39, 44.

Beginning in 2004, she believes that she has learned to adapt.  As long as she does not have to go outside the house and stays in surroundings of her own making, she can function.  For example, she can do housework.  *Id.* at 39.

As of the hearing, Ms. Cumbie was taking Xanax but she has panic attacks that may occur perhaps twice a week.  *Id.* at 40.  If she goes out, she will take Xanax.  Her

panic attacks occur, for example, when she sees a police car in front of her house because there is a lot of parking on the street or when somebody will knock really loud on her door.  *Id.*  When she takes Xanax, it makes her go to sleep and when she awakes, she can focus anew.  *Id.* at 40-41.

Ms. Cumbie has a few neighbors she speaks with as well as one friend whose husband is a general practitioner who has provided her with medical attention.  *Id.* at 41. She has no hobbies aside from housework and yard work.  *Id.*  She only reads approximately 30 minutes a day as reading puts her to sleep.  She only watches television for maybe an hour a night at best.  *Id.* at 41-42.  When she does watch a favorite show, she can follow it all the way through the one-hour time period.  *Id.* at 42. She does not nap during the day unless she takes her medicine or reads.  *Id.*  She has been sleeping better now at night, usually going to bed about 9:00 p.m., waking up about three or four times every night, which has been usual for her since she started having problems.  *Id.* at 42-43.

Ms. Cumbie has flashbacks (of people coming to arrest her and being in court) and nightmares all of the time.  *Id.* at 42-43, 64.  She experienced one confrontation at her house with media representatives with cameras waiting for her.  "[P]eople would come to [her] and go, 'Weren't you that lady that stole money from people,' in the middle of the grocery store."  *Id.* at 44; *see id.* at 164 (a neighbor's description of Plaintiff-April 8, 2008).  She tried to avoid these confrontations and go out, even to the doctor's office, when she could not be seen.  *Id.* at 64.  (Ms. Cumbie has "mental pain not physical pain."  *Id.* at 155.)

## B.  Robert C. Bradley (Vocational Expert)

Mr. Bradley testified, without objection, as an impartial vocational expert.  *Id.* at 9, 44-51.  He reviewed the file and heard Ms. Cumbie's testimony.  *Id.* at 45.

Mr. Bradley reviewed Plaintiff's work history over the past 15 years that included one job as a financial planner, classified as sedentary and skilled, with a SVP of 8 and performed at the sedentary level.  *Id.* at 45.  Mr. Bradley stated that Ms. Cumbie acquired transferable skills to other sedentary work at age 55 such as conducting financial analysis and credit evaluation.  These jobs included investment analyst, sedentary with a SVP of 8; mortgage clerk, sedentary, with a SVP of 5; credit clerk, sedentary, with a SVP of 4.  *Id.* at 45-46.

The ALJ and Mr. Bradley had the following colloquy:

Q: . . . Okay, let's now go to hypothetical questions.  Let's assume we have an individual -- well, first of all – [INAUDIBLE] go back to the date last insured.  Let's see -- let's say between the age of 47 and, say, 49-years-of-age and let's assume the person has a 12th [sic] education and two year degree as certified financial planner.  And let's assume a good ability to read, write, and use numbers.  Let's assume the past work history just described and shown on 17-E [R. 194].  Let's assume no physical restrictions and no restrictions on use exhibit number 12-F, which is the DDS restrictions completed around September of '08 and supposed to be as of the date last insured in '03.  Let's assume the individual has moderate restrictions on the ability to maintain attention, concentration for extended periods.  Whoops -- and do -- let's see -- completing normal workday and workweek without interruptions from psychologically-based symptoms, and to perform in a consistent pace [INAUDIBLE] unreasonable number, I think, of rest periods.  To respond appropriately to changes in the work setting, and let's see -- going to Page 3 the functional capacity assessment, let's assume this person is able to understand and follow instructions, is able to demonstrate a cooperative attitude, can make basic work decisions, can adapt adequately to work environments.  This person has some reduction in concentration that would limit her ability to complete complex tasks.  Has some reduction in social interaction, stress tolerance that would limit her to work environments of low social demand.  So I guess what we're talking about basically, is we're limited to simple, basic, routine type tasks and low social demand.  So with those restrictions would there be any jobs in the regional or national economy such a person could perform, first of all consider the past, relevant work?

A: No to past work.

Q: Okay.  Would there be any other jobs such a person would be able to perform?

A: Yes.  There would be.

Q: Any of the past, relevant work -- any of the transferable jobs you mentioned?

A: No.

Q: Okay.  What other jobs are we talking about?

A: Unskilled work, SVP 2, light duty housekeeper would be one.

Q: Okay, housekeeper.

A: DOT --

Q: You said it was like an unskilled?

A: Yes.

Q: SVP2?

A: Uh-huh.

Q: Okay, what was the DOT Number for that?

A: 323 –

Q: Excuse me – say again.

A: 323687014.  And in terms of approximate numbers there are approximately 350,000 positions in the United States and 25,000 positions within the state of Florida.  Another example is dining room attendant: DOT Number 311677010, nationally there are approximately 75,000 positions, state of Florida 2500 positions.

Q: Any sedentary examples?

A: Yes.  Surveillance system monitor: DOT Number 379367010, nationally there are proximally 55,000 positions, state of Florida 1,200 positions.  And a second example is laminator1: DOT Number 690685258, nationally approximately 35,000 positions, state of Florida approximately 750.

Q: Okay, and this is also sedentary and unskilled?

A: Mm-hmm.

Q: Is this an exhaustive list or representative list?

A: Representative.

Q: Okay. May I ask counsel, are there any treating physician restrictions in the file? I didn't see any, but I may have missed them.

ATTY: Other than the doctors restrictions form submitted today, that was just a -- not necessarily restriction just saying he had rendered her unable to work.

ALJ: That's sort of a conclusion –

ATTY: Yes.

ALJ: -- I'd like to [INAUDIBLE] some.

ATTY:  But no, I mean there's not a necessarily restriction level like concentration, focus, memory, hours anything like that.

ALJ: Okay.  Would you like to have some questions to the vocational expert?

ATTY: Yes, sir.

ALJ: Go ahead.

### Examination of Vocational Expert by Claimants' [sic] Attorney

Q: Hypothetical individual aged 47 to 49 with a -- same physical limitations and educational background as the claimant, however, if her testimony was deemed credible by the administrative law judge as to the restrictions he's listed today, would you feel that her  would there be any work that she'd be able to competitively compete at?

ALJ: Can you be a little more specific as far as what you mean by credible testimony?  What part -- you know, she testified for about a half an hour, so there is something in particular that [INAUDIBLE].

ATTY:  Yes, Sir.   Okay, I'll go specifically.

ALJ: Yeah, that's what we need.

**Examination of Vocational Expert by Claimants' [sic] Attorney**

Q: If a hypothetical individual had panic attacks up to two times a week which involve them to take medication and sleep for two or three hours would that eliminate the ability to hold down employment?

A: If it was during the normal work hours, yes.

Q: Okay, if the individual was to have to take more than two day [sic] out of a month to call in for unscheduled absenteeism due to panic attacks, stress attacks, would that render them unable to compete?

A: Yes.

ALJ: This is twice a month now?

ATTY: Yes, sir.

ALJ: Okay.

VE: Yes.

**Examination of Vocational Expert by Claimants' [sic] Attorney**

Q: If a hypothetical individual while at a job as a stressful indication would they be allowed to take a two hour nap break in the course of regular employment to recover from that after taking medication?

A: No.

ALJ: Anything else?

ATTY: No, sir.  That's it.

*Id.* at 44-51.  The hearing then concluded.  *Id.* at 52.

**C.  Medical Evidence Between the Alleged Onset date, January 15, 2001, and the Date Last Insured, December 31, 2003**

On December 6, 2002, Plaintiff first saw F.A. Munasifi, M.D., for a "psychiatric

evaluation" at Dr. Suzanne Morgan's referral for post traumatic stress disorder (PTSD).

*Id.* at 231.  Plaintiff reported being a successful financial planner/advisor who retired in

2001.[2]  *Id.*  As the stock market declined, civil lawsuits ensued and she was charged

with a crime and arrested.  She reported that since her arrest, she felt stressed out, was

upset with anxiety attacks, had difficulty sleeping, was in a depressed mood, avoided

going out and to church, and went shopping late at night to avoid people to whom she

has been portrayed as a 'criminal.'  *Id.*  Family problems were noted.  Plaintiff reported

that she gave away all her guns except one that she "refuses to give away and keeps

as a last resort."  *Id.*  She asserted, however, that she would not kill herself.  Plaintiff

stated that she had restarted Zoloft again.  *Id.*

On December 10, 2002, Plaintiff first met with Linda M. Smith, Ph.D., LMFT, for

psychotherapy with PTSD symptoms.  (Dr. Munasifi referred her to Dr. Smith.)  Plaintiff

had a sad affect and was crying during the session.  Marriage concerns were noted.

Her new medication was helping her sleep better.  *Id.* at 211, 246.  On the same date,

Dr. Munasifi saw Plaintiff briefly and noted that Plaintiff's sleep, mood, and affect were

better, she denied suicidal ideation, and she was "thinking clearing [sic]."  *Id.* at 246.

On December 18, 2002, Plaintiff saw Dr. Smith reporting that she was doing

better and her crying had decreased, she had some hope, and she had no recent panic

attacks, was sleeping well and without nightmares, and looked forward to spending the

holidays with her in-laws.  *Id.* at 210, 246.

On December 30, 2002, Plaintiff was referred for hospitalization by Dr. Munasifi

after an overdose attempt.  *Id.* at 199, 232.  Plaintiff reporting taking ("in the hospital

parking lot") a mixture of about 60 pills including Xanax, Zyprexa, and Zoloft, waking up

eighteen hours later, and returning home and referred "to the EC [Emergency Center]"

---

[2]  This evaluation is one page.  The ALJ noted that "this exhibit is missing the
actual evaluation and diagnosis."  *Id.* at 13.  There are no patient notes from Dr. Morgan
in the Record.

by a physician called by her husband.  This was her first hospital admission.  *Id.* at 199-200, 232, 247.  Plaintiff admitted to using alcohol "to handle some of her 'panic attacks' following her arrest."  *Id.* at 199-200, 234.  Plaintiff admitted to fasting and was sad, tearful, withdrawn, and visibly distressed.  *Id.* at 201.  Plaintiff entered the hospital voluntarily and was discharged (after a one night stay, *id.* at 209, 248) at her request (her husband agreed) against medical advice with the diagnoses of major depression, severe, single episode and was discharged on Lexapro and Vistaril.  Her GAF for the past year was 86 and currently 78.  *Id.* at 201-02, 237; *see also id.* at 247.

On January 9, 2003, Plaintiff saw Dr. Smith stating that she had "learned her lesson," was doing better, sleeping okay, feeling more focused, and had the support of one friend.  Her mood was less depressed and affect appropriate.  Marital stress was noted.  *Id.* at 209, 248.

On January 29, 2003, Dr. Munasifi noted Plaintiff was tearful and depressed and "still under significant psychosocial stress and unable to function," but somewhat better and taking Lexapro and Seroquel.  She was not suicidal, but still had anxiety, depression, and PTSD manifestation.  *Id.* at 249.

On February 6, 2003, Plaintiff informed Dr. Smith that she was doing better, but was still highly anxious with some hypervigilance such as when she goes to the mailbox or her doorbell rings.  Dr. Smith noted Plaintiff was isolated.  Marital issues were noted. *Id.* at 207, 249.

Dr. Munasifi noted during a February 19, 2003, visit, Plaintiff was reporting crying episodes, being terrified when going to the mailbox, finding packages of accusatory material, and was tearful throughout the session.  She continued to be under stress with

evidence of PTSD.  *Id.* at 250.  Dr. Munasifi opined that "she is unable to work and function at the present time."  He prescribed a continuation of Seroquel at bedtime, and Xanax as needed, with Lexapro doubled in dosage.  *Id.*

In March and April 2003, *id.* at 204-06, 250-53, Dr. Smith noted Plaintiff was weepy and experiencing problems with short-term memory.  Although she was not having nightmares or traumas, she was still having vivid dreams and still was unable to do reading.  *Id.* at 205, 251.  Social situations also increased her anxiety greatly, so Plaintiff tended to isolate herself.  She was noted to be exercising, however, and "attempting to cope the best she can and that she has made some progress."  *Id.* at 206, 251.  Plaintiff planned on attending her daughter's graduation from boot camp, but reported a sense of paranoia about what might happen while she is away and reported anxiety about leaving.  *Id.* at 204-05, 251, 253.  By April 25, 2003, her marital relationship had improved.  *Id.* at 204, 253.

On March 12, 2003, Dr. Munasifi noted that Plaintiff was improving, exercising, and was doing some work around the house such that treatment could now be every three to four weeks; however, she "continues to be disabled from employment and functioning in a job situation."  *Id.* at 251.

On April 7, 2003, Plaintiff continued to have stress, but was able to sleep and the panic attacks were getting less and she was not suicidal.  Dr. Munasifi also noted that although she "is eager and motivated to go to work [one] day" and "[s]he tries to get better because she doesn't want to be on disability for an extended period of time and sees this as a temporary situation until the depression, the anxiety and the panic is remitted," she was "still unable to function at the present time and she remains

disabled." *Id.* at 252.  "Any amount of stress seems to tilt the balance and throws her

into a crisis." *Id.*  Dr. Munasifi thought they were "on the right track," but it would "take

her some time to heal through." *Id.*

On April 26, 2003, Dr. Munasifi completed an Attending Physician's Statement

(APS) indicating prior treatment dates, and in the paragraph 5.a) box, indicated that

Plaintiff was "completely unable to work," but in another box he indicates that she was

expected to return to work no sooner than in "6-12 months." *Id.* at 309.  Depression and

anxiety were noted as the conditions causing the work impairment.  *Id.*

On May 7, 2003, Dr. Munasifi noted Plaintiff continued to have post-traumatic

stress events in which she gets panicky, flashbacks, anxiety, and fear.  He opined

Plaintiff "is disabled, cannot function, very fragile, easily distracted with anxiety and

depression."  Xanax was restarted.  *Id.* at 255.  A May 7, 2003, handwritten patient note

by Dr. Smith states: "all kinds of stress people parking in her driveway 2 policemen=

driveway-neighbor alarm system went off" and mention of a letter and paid ticket that

was discussed during an April 25, 2003, session.  *Id.* at 253. (This may have been

Plaintiff's last visit with Dr. Smith.  *Id.* at 14.)

On October 21, 2003, Dr. Munasifi noted Plaintiff was "[d]oing well" and had

"[s]ome depression, but stopped her Lexapro" and Seroquel and was only taking "Xanax

prn." *Id.* at 256.  (By March 23, 2004, Dr. Munasifi noted Plaintiff stopped taking her

medication, except Xanax, in October 2003.  *Id.*)

On October 29, 2003, Dr. Munasifi completed a second APS form indicating

Plaintiff remained completely unable to work due to severe depression and PTSD, and

would be expected to return to work in six months, but possibly not for more than 12

months.   Depression/anxiety and PTSD are noted as reasons preventing Plaintiff from

working.   *Id.* at 308.

On December 16, 2003, Dr. Munasifi noted Plaintiff still had "psychosocial

stressors, legal case."   *Id.* at 256.   Plaintiff's mood was okay, but sometimes she "gets

depressed in reaction to situations."   *Id.*   Sleep is still a problem and she was prescribed

Desyrel for sleep and anxiety in addition to Xanax.   Plaintiff was to be seen in six to

eight weeks.   *Id.*

**D.  Medical Evidence After January 1, 2004**

On February 10, 2004, Dr. Munasifi noted that Plaintiff was "overall managing"

with Xanax prn, but still had "significant stress, disabled, unable to function in her

profession."   *Id.* at 256.   Her legal condition was discussed and the PTSD events

stemming from that was also discussed.   *Id.*

On March 23, 2004, Plaintiff was very distressed, tearful, crying, and depressed.

She feels she is stressed because of her legal case.   *Id.*   She stopped taking her

medication, except Xanax, in October 2003.   *Id.*   Dr. Munasifi suggested Plaintiff start

taking Lexapro again with a gradual increase in dosage, and provided a prescription.

*Id.*   He opined Plaintiff "gets to be obsessive and ruminative about old situations and

finds her lawyers, files [sic] the wrong papers and the people under deposition confess

to arresting her without investigating her case.   She is alert and oriented, has depressed

mood, sad affect and tearful."   *Id.*   "Her thinking is clear," although "[s]he has difficulty

with concentration, attention and some memory because of depression."   *Id.*   The plan

was to increase the antidepressants.   *Id.*

On May 25, 2004, Plaintiff was referred for emergency treatment after being found in a parking lot of the Fletcher Building 24 to 36 hours following an overdose attempt, similar to her prior attempt.  *Id.* at 195-98.  Plaintiff said although she was "doing well" following the prior discharge in December 2002, she did not remember when things got out of hand.  *Id.* at 195, 239.  Plaintiff had saved approximately 240 Xanax tablets and taken them ground up in a coffee grinder and added to a Slim Fast drink in an overdose attempt, and wrote "I want to die" on her arms.  *Id.* at 195, 239, 244.  Plaintiff was "very sad, tearful, distressed, talks constantly about the harassment that she is experiencing, how she is at wit's end and how to deal with it."  *Id.* at 196. Although Plaintiff denied suicidal ideation, the evaluator opined she was "embellishing her presentation to prompt a discharge."  *Id.*  "She is known to present with an average to above average intellectual capacity and to present with an average to above average fund of knowledge."  *Id.*  Plaintiff was hospitalized to try and stabilize her suicidal thoughts, and was prescribed Prozac for depression and a low dose of Ativan for anxiety as needed.  *Id.* at 197, 242.  Plaintiff reported feelings of persecution, nightmares, panic attacks if someone pulls into the driveway or drives by the house slowly.  *Id.* at 245.  Plaintiff stabilized and was discharged home on May 29 with a diagnosis of major depression, recurrent.  Her GAF was about 60 on discharge.  *Id.* at 197, 242; *see id.* at 238-45.

On July 15, 2004, Plaintiff was evaluated by Kay C. Guthrie, Ph.D., to provide clarification regarding her diagnoses and to assist in further treatment decisions. Plaintiff reported depression, anxiety, panic attacks, post traumatic stress, and isolative behavior with symptoms starting with her arrest four years prior.  Plaintiff stated that

occasionally, with preparation, she can go out socially.  *Id.* at 224-25.  Plaintiff reported

being in good health.  Plaintiff was taking Zoloft, but reported difficulty sleeping and

concentrating, nausea/vomiting, panic attacks, and early morning awakening.  *Id.* at

225.  Upon examination, Plaintiff was tearful and agitated, with an obsessive and

digressive thought process and some passive suicidal ideation.  Dr. Guthrie found that

Plaintiff did not meet the diagnostic criteria for Obsessive Compulsive Disorder despite

a significant number of symptoms, but did meet the diagnostic criteria for PTSD, Social

Phobia, Panic Disorder with Agoraphobia, and Dysthymic Disorder.  *Id.* at 226-28.

Dr. Guthrie recommended that Plaintiff continue seeing Dr. Munasifi for medical review

and evaluation; remain in therapy with Dr. Guthrie; and that Plaintiff read the packet of

information that was provided as well as additional resources to learn about the

identified diagnosis and effective coping strategies.  *Id.* at 228.

　　　　On August 30, 2004, Dr. Munasifi reported that Plaintiff was doing well, although

she began to get depressed.  Zoloft did not work so she began using her old Prozac

and after a few days she felt better.  Plaintiff was alert and oriented with memory intact,

thinking okay, with a sad mood, but not suicidal or dangerous to others.  *Id.* at 254.

　　　　On October 11, 2004, and on February 18, 2005, Dr. Munasifi completed two

separate APS forms indicating Plaintiff was still completely unable to work for more than

12 months due to continued anxiety and depression.  *Id.* at 305-06.

　　　　On January 26, 2005, Dr. Munasifi noted that most of Plaintiff's cases are

resolved with one remaining.  *Id.* at 257.  Plaintiff is conflicted with her marital situation.

Plaintiff sold her house today to pay the attorneys.  "[A]lthough she is upset about what

is happening to her legally. She is managing really well."  *Id.*  Dr. Munasifi also noted

that Plaintiff "gave [him] good advice about the plan she had given [him] and [he] will see her in the office in about 4 to 6 weeks." *Id.*

On June 8, 2005, Dr. Munasifi noted Plaintiff still suffered from anxiety and depressive symptomatology, and her activity was so significantly limited "it is an effort for her to come and see the doctor," but she is not suicidal. *Id.* Dr. Munasifi opined that Plaintiff still had a significant amount of stress and was unable to function in any professional capacity. In his opinion and at this time Plaintiff remained disabled, but Dr. Munasifi hoped that "once the stress is decreased and things turn the corner," she will be able to heal and move to the next step of her life. *Id.* Plaintiff was alert and oriented, her memory good, tearful, no psychosis, and not a danger to herself or others. *Id.*

By August 3, 2005, Dr. Munasifi noted Plaintiff was dealing with her stressors, exercising, and "taking care of her personal looks and appearance" while maintained on Prozac. *Id.* at 257.

On September 1, 2005, Dr. Munasifi wrote a letter to the NASD Dispute Resolution stating Plaintiff was diagnosed with PTSD including having two hospitalizations and should not have a hearing and a trial at the same time. *Id.* at 310.

On September 19, 2005, Dr. Munasifi completed an APS form indicating Plaintiff was completely unable to work for more than 12 months, without any change from the prior APS. *Id.* at 304. In a separate patient note, Dr. Munasifi opined Plaintiff was "managing," but "still disabled" with "multiple psychosocial stressors and depressed." *Id.* at 257. She was continued on Prozac. *Id.*

By January 23, 2006, Plaintiff reported that the criminal case was dropped and civil case over.  Plaintiff felt relief and is improved.  *Id.* at 258.  "She is still very sensitive to interaction with clients.  These issues were discussed."  *Id.*  Dr. Munasifi recounted prior suicidal attempts and stress that drove her to that.  Dr. Munasifi opined Plaintiff "seems to have developed [PTSD] from the implications, especially as she notices what some clients have reported distortions of truth and lies.  She is unable to function in her previous capacity."  *Id.*  Plaintiff was continuing to be treated with Prozac and to continue regular with her treatment with Dr. Munasifi.  *Id.*

On June 4, 2007, Dr. Munasifi again completed an APS and opined that Plaintiff would be completely unable to work for more than 12 months.  *Id.* at 303.  No changes in Plaintiff's condition were noted.  *Id.*

On February 15, 2008, an SSA claims representative noted Plaintiff had difficulty concentrating, talking and answering questions.  She noted the interview was lengthy and over two and a half hours, and Plaintiff was crying throughout the interview, was observed to have a very red face, and would get very quiet at times and not answer her questions, and had "a very hard time concentrating, kept looking around and behind her."  *Id.* at 133.

On April 8, 2008, an SSA claims representative called Plaintiff's friend, Ann O'Brien, for a statement.  *Id.* at 164.  Ms. O'Brien explained that Plaintiff was previously very outgoing and friendly, but after the arrest in approximately June 2001, Plaintiff became very stressed and embarrassed to be seen in public.  She noted that Plaintiff had a difficult time walking down the street, and would turn around and go home if someone came out to their yard or drove by.  She would also 'freak out' if she were in a

situation where she could not leave a public area.  *Id*.  She also noted she "looked

awful," was probably not bathing regularly, and wore stained clothes covered in dog

hair.  *Id*.  She reported that Plaintiff would go shopping at strange times to avoid the

public, and spent most of her time gardening.  She never went back to church after the

arrest, and at a 50th birthday party her husband planned, she "spent the whole time

'[cowering] away from people and crying.  She could not speak without crying."  *Id*.

On April 14, 2008, non-examining State agency psychologist Thomas Conger,

Ph.D., completed a mental RFC assessment and opined that as of her date last insured

of December 2003, that "[a]though the claimant's condition may have resulted in some

social difficulties as well as a negative reaction to criticism at times, she showed the

ability to relate effectively when she did interact.  Mentally, she was capable of

performing routine tasks on a sustained basis and is judged to have an adequate

understanding and adaptation abilities."  *Id*. at 279.  Plaintiff had no "markedly limited"

limitations.  *Id*. 277-79 (exhibit 9F).  On April 14, 2008, Dr. Conger also provided a

psychiatric review technique.  *Id*. at 263-76 (exhibit 8F).  His consultant's notes reflect,

in part, the following:

> A review of the evidence indicates that the claimant did receive treatment for a
> major depression and was hospitalized in 12/02.  However, the claimant
> improved with treatment and the follow-up treatment records indicate a stabilized
> condition with her cooperation with the outpatient treatment services.  The 3rd
> party input indicate [sic] that, prior to the DLI, the claimant was living
> independently and was able to perform routine tasks effectively.  Although she
> was socially isolated due to embarrassment over being arrested, she did show
> the ability to relate effectively when she did interact.  Based on the totality of
> evidence, the claimant is judged to have been capable of independent
> functioning and there was no indication of a mental impairment that would have
> met or equalled [sic] any listing prior to her DLI (12/31/03).

*Id.* at 275.  (Plaintiff does not contend that her mental impairments met or equaled as Listing.)  Dr. Conger also noted:  Dx: Major Depression, Recurrent, in partial remission." *Id.*

On September 22, 2008, a second non-examining State agency psychologist James Levasseur, Ph.D., completed a mental RFC assessment and opined that Plaintiff would have "some reduction in concentration that would limit her ability to complete complex tasks" and "some reduction in social interaction/stress tolerance that would limit her to work environments of low social demand."  *Id.* at 286.  Plaintiff is able to understand and follow instructions, to demonstrate a cooperative attitude, able to make basic work decisions, and able to adapt to work environments.  There were no "markedly limited" limitations noted.  *Id.* at 284-86 (exhibit 12F).  Dr. Levasseur also completed a psychological review technique, *id.* at 288-300, and opined, in part, that overall there was "no compelling indication of any marked limitations so much as moderate limitations in social and CPP.  An MRFC is provided."  *Id.* at 300 (exhibit 13F).[3, 4]

---

[3]  The ALJ referred to the conclusions reached by Drs. Conger and Levasseur, *id.* at 15, but referred to them as "physicians," not psychologists, and stated: "Although these physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exist a number of other reasons to reach similar conclusions.  These physicians concluded that the claimant only had mild to moderate mental limitations (Exhibits 8F, 9F, 12F, and 13F)."  *Id.*

[4]  Dr. Levasseur referred to Plaintiff's admission in December 2002, noting in part a "GAF of 60 at discharge."  *Id.* at 300.  Rather, Plaintiff's GAF score was 86 for the past year and 78 at the time of admission in December 2002.  *Id.* at 201, 237.  On May 25, 2004, during Plaintiff's second hospital admission, Plaintiff's GAF score was about 60 on discharge.  *Id.* at 197, 242.

## V. Legal Analysis

Plaintiff argues that the ALJ erroneously rejected the opinion of the treating psychiatrist, Dr. Munasifi, and erred in inadequately assessing Plaintiff's credibility. Before discussing the merits of the case, the Court notes that this is an application only for DIB.  Ms. Cumbie claims that her onset of disability was on January 15, 2001.  The ALJ found, without objection, that Ms. Cumbie's last met the insurance requirements of the Social Security Act on December 31, 2003.  R. 9.  Therefore, the issue before the Court is whether Ms. Cumbie was disabled during the narrow, almost three-year window between those two dates (the relevant period), and whether such disability lasted, or could be expected to last, for at least 12 months.

As noted above, Plaintiff's alleged onset date is January 15, 2001.  *Id.* at 9. Throughout the record, Plaintiff explained that she was a successful financial planner for approximately 15 years or more prior to the decline in the stock market in and around 2000-2001.  She was last employed in or around March 2001, thus began her decline according to Plaintiff.  Within several months, she was involved in lawsuits brought by former clients, counter claims brought by former companies she did work with and for, and ultimately arrested in June 2001 and criminally charged.  Plaintiff spent approximately three years fighting former clients and companies in responding to civil lawsuits and criminal charges.  Ultimately she was successful, but those events took their toll.

### A.  The Opinions of Treating Psychiatrist Dr. Munasifi

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of record.  Doc. 11 at 10-13.  Specifically, Plaintiff argues that the ALJ improperly assigned

too little weight to the opinions of Plaintiff's treating psychiatrist, Dr. Munasifi.  R. 14.  In addition, Plaintiff argues the ALJ failed to properly evaluate the opinions of the non-examining state-agency psychologists (Drs. Conger and Levasseur, *id.* at 263-80, 284-301).  Doc. 11 at 10, 13.  *See supra* at 27 n. 3.

On December 6, 2002, Plaintiff first saw Dr. Munasifi for a psychiatric evaluation (for PTSD) at the request of Dr. Morgan.  This is Plaintiff's first psychiatric evaluation of record.  Plaintiff reported being stressed out since her arrest, upset with anxiety attacks, having difficulty sleeping, and a depressed mood, and overall avoided public outings. *Id.* at 231.  On December 10, 2002, Dr. Munasifi had a brief visit with Plaintiff.  Her sleep, mood, and affect were better; she denied suicidal ideation; and she was thinking clearly.  *Id.* at 246.  On December 10 and 18, 2002, Plaintiff met with Dr. Smith, a psychologist, for psychotherapy with PTSD symptoms.  *Id.* at 210-11, 246.  By December 18, Plaintiff had no recent panic attacks, was sleeping well and without nightmares, and looking forward to spending the holidays with her in-laws.  *Id.* 210, 246.

On December 30, 2002, Plaintiff was referred for hospitalization after an overdose attempt.  *Id.* at 199, 232.  She was discharged after a one night stay with a diagnosis of major depression, severe, single episode and was discharged on Lexapro and Vistaril.  Her GAF for the past year was 86 and currently 78.  *Id.* at 201-02, 237, 247.

On January 29, 2003, Dr. Munasifi noted Plaintiff was tearful and depressed and "still under significant psychosocial stress and unable to function," but somewhat better and taking Lexapro and Seroquel.  *Id.* at 249.  On February 19, 2003, Dr. Munasifi noted Plaintiff was terrified when going to the mailbox and finding packages of

accusatory material.  Dr. Munasifi records his first opinion that Plaintiff "is unable to work and function at the present time."  *Id.* at 250.  No rationale is given for this opinion.

On March 12, 2003, Dr. Munasifi noted that Plaintiff was improving, exercising, and was doing some work around the house such that treatment could now be every 3 to 4 weeks; however, she "continues to be disabled from employment and function in a job situation."  *Id.* at 251.  No rationale is given for this opinion.

On April 7, 2003, Dr. Munasifi noted that Plaintiff continued to have stress and was unable to sleep, but the panic attacks are getting less and she was not suicidal. The doctor also noted that although she "is eager and motivated to go to work [one] day" and she "tries to get better because she doesn't want to be on disability for an extended period of time and sees this as a temporary situation until the depression, the anxiety and panic is remitted," she was "still unable to function at the present time and she remains disabled."  *Id.* at 252.  "Any amount of stress seems to tilt the balance and throws her into a crisis."  *Id.*  Dr. Munasifi does not explain why Plaintiff's condition causes her to be "unable to function," disabled, and necessarily unable to work.  *Id.*

On April 26, 2003, Dr. Munasifi completed an APS form (first of several), checking a box indicating that Plaintiff was "completely unable to work," and in another box indicated that she was expected to return to work no sooner than 6 to no more than 12 months.  *Id.* at 309.  Depression and anxiety were noted as the conditions causing the work impairment, but Dr. Munasifi does not provide any specific reasons why Plaintiff cannot work in any capacity.  It is uncertain whether the doctor's opinion that

Plaintiff is "completely unable to work" relates to Plaintiff's inability to perform her prior occupation as a financial planner or some other form of work.[5]

On May 7, 2003, Dr. Munasifi noted Plaintiff continued to have post-traumatic stress events and opined that Plaintiff "is disabled, cannot function, very fragile, easily distracted with anxiety and depression." *Id.* at 255.  Xanax was restarted.  *Id.*  (On the same date, Dr. Smith provided a handwritten patient note indicating that Plaintiff was under stress-people parking in her driveway; two policeman in her driveway; neighbor alarm system went off.  *Id.* at 253.)

Over five months later, on October 21, 2003, Dr. Munasifi noted Plaintiff was "[d]oing well" and had "[s]ome depression, but stopped her Lexapro" and Seroquel and was only taking Xanax "prn."  *Id.* at 256.  (On March 23, 2004, Dr. Munasifi reported Plaintiff stopped taking her medication, except Xanax, in October.  A February 10, 2004, note indicates Plaintiff was "overall managing with Xanax."  *Id.* at 256.)

On October 29, 2003, Dr. Munasifi completed a second APS form indicating Plaintiff remained completely unable to work due to severe depression and PTSD, and would be expected to return to work in six months, but possibly not for more than 12 months.  Depression/anxiety and PTSD are noted as reasons preventing Plaintiff from working, but no further explanation is provided.  *Id.* at 308.

On December 16, 2003, Dr. Munasifi Plaintiff still had "psychosocial stressors, legal case."  *Id.* at 256.  He noted her mood was okay but that she "gets depressed in

---

[5]  For example, on February 10, 2004, Dr. Munasifi noted that Plaintiff "[c]ontinue[d] to have significant stress, disabled, *unable to function in her profession* but overall managing with Xanax prn."  *Id.* at 256.  (emphasis added).  On June 8, 2005, Dr. Munasifi noted that Plaintiff was unable to function in any *professional* capacity, *id.* at 257, and on January 23, 2006, he noted that Plaintiff was unable to function in her *previous capacity, id.* at 258.  (emphasis added).

reaction to situations." *Id.*  Sleep is still a problem and she was prescribed Desyrel for

sleep and anxiety in addition to Xanax, which had been prescribed throughout the

course of treatment.  *Id.*

On March 23, 2004, Dr. Munasifi noted that Plaintiff "feels that she is stressed

out because of her legal case.  She stopped her medication back in October so we

talked about going back to the medicine, going back to her treatment, starting her on

Lexapro again, 10 mg for a week and then 20."  *Id.* at 256.  After making several other

observations, he added: "She is alert and oriented, has depressed mood, sad affect and

tearful.  She is not dangerous to herself or others.  Her thinking is clear.  She has

difficulty with concentration, attention and some memory because of depression.  Our

plan is to increase the antidepressants and see her in the office in 2 to 3 weeks, and

have the depression stabilized."  *Id.*  Dr. Munasifi does not tie these observations to his

conclusion that Plaintiff, although impaired, was disabled and could not work.[6]

After reviewing Dr. Munasifi's treatment notes from December 6, 2002, through

February 10, 2004, *id.* at 13-14, the ALJ gave "little weight to the opinion of Dr. Munasifi

because it is not supported by objective medical findings and it is inconsistent with the

evidence of record when considered in its entirety."  *Id.* at 14.  The ALJ further noted

"that Dr. Munasifi's own reports fail to reveal the type of significant clinical abnormalities

one would expect if the claimant were in fact disabled, and the doctor did not specifically

address this weakness.  Furthermore, the opinion expressed by Dr. Munasifi is quite

conclusory, providing very little explanation of the evidence relied on in forming that

opinion."  *Id.*

---

[6]  Dr. Smith's treatment notes from December 10, 2002, through on or about
May 7, 2003, are discussed herein at pages16 through 21.  The medical evidence after
January 1, 2004, is discussed herein at pages 21 through 28.

The ALJ did not err in discounting Dr. Munasifi's opinion.  First, although not mentioned by the ALJ, the doctor's opinion that Plaintiff was disabled and unable to work was not dispositive for purposes of Social Security claims.  The Commissioner's regulations and interpretations of those regulations provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of the claimant's impairments, but that the ultimate question of whether there is a disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R § 404.1527(d)(1) specifically states that a finding of disability or inability to work by medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R § 404.1527(d)(3); *see also* Social Security Ruling (SSR) 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions "can never be entitled to controlling weight or given special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  *Id.*

Although he is not a vocational expert, aside from noting on March 23, 2004, that Plaintiff "has difficulty with concentration, attention and some memory because of depression," but thinking clearly, *id.* at 256, Dr. Munasifi provides no explanation of the mental skills needed for particular jobs which Plaintiff lacked during the relevant period.[7]

---

[7]  The ALJ found that Plaintiff "was unable to perform any past relevant work" as a certified financial planner.  *Id.* at 15; *see supra* at 31 n.5.  This finding is supported by substantial evidence, including the testimony of Mr. Bradley, *id.* at 47-48, and

Because the opinions (in the two APS forms and treatment notes) of Dr. Munasifi that Plaintiff is disabled and unable to work were conclusory, unsupported, and inconsistent with the record, the ALJ properly accorded little weight to his opinions.  *See* Phillips, 357 F.3d at 1240.

Plaintiff also contends that the ALJ should have re-contacted Dr. Munasifi so that he could supplement his opinions with additional information.  Doc. 11 at 11-12.  While the ALJ has a duty to develop a full and fair record, the ALJ is not required to obtain additional evidence if the record is sufficient for the ALJ to make a decision.  *See* Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999); 20 C.F.R. § 404.1512(e); SSR's 96-5p and 85-16.  The Record contains Dr. Munasifi's treatment notes and opinions authored over time.  In addition, the Record included multiple assessments of another mental-health expert, Dr. Smith, *id.* at 204-11, 246-53.  The ALJ had a full record and was able to make a decision on Plaintiff's case based upon this record.

Plaintiff also asserts that the ALJ gave too much weight to the state-agency psychologists, Drs. Conger and Levasseur.  Doc. 11 at 10, 13.  (Both psychologists rendered opinions in April 2008 (Conger) and September 2008 (Levasseur).  *Id.* at 262-80, 284-301.)  The ALJ discussed their opinions and afforded them "some weight" after acknowledging that they were non-examining physicians "and therefore their opinions did not as a general matter deserve as much weight as those of examining or treating physicians."  *Id.* at 15; *see supra* at 27 n.3.  The state-agency psychologists noted some

---

Dr. Munasifi, *id.* at 256.  The ALJ also found that Plaintiff's "ability to perform work at all exertional levels was compromised by nonexertional limitations," requiring inquiry from Mr. Bradley who opined that Plaintiff could perform such representative jobs as a housekeeper and dining room attendant (light, unskilled) and surveillance systems monitor and laminator (sedentary, unskilled).  *Id.* at 16.  Also, the ALJ found that Plaintiff had moderate restrictions in her ability to maintain attention and concentration for extended periods.  *Id.* at 12.

medical evidence that supported their opinions.  *Id.* at 15, 275, 300.  The ALJ properly accorded the appropriate weight to these opinions.

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence because it did not sufficiently account for Plaintiff's disturbed thinking, isolative behavior, and minimal stress tolerance with suicidal behavior. Doc. 11 at 13.  Substantial evidence supported the ALJ's RFC finding.

A RFC is what a claimant can still do despite limitations.  20 C.F.R § 404.1545(a)(1).  It is an assessment based upon all the relevant evidence the claimant's description of limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.* § 404.1545(a)(3).  The responsibility for determining the claimant's RFC lies with the ALJ.  *Id.* § 404.1546(c).

The ALJ determined that Plaintiff could perform a full range of work at all exertional levels, with several non-exertional restrictions, including *moderate restrictions* in Plaintiff's ability to maintain attention and concentration for extended periods; complete a normal work day work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and respond appropriately to changes in the work setting.  R. 12.  ALJ also found, however, that Plaintiff is able to understand and follow instructions, demonstrate a cooperative attitude, make basic decisions, and adapt adequately to work environments.  *Id.*  The ALJ further found that Plaintiff has some reduction concentration that would limit her ability to complete complex tasks and that she has some reduction in social

interaction/stress tolerance that would limit her to work in environments of low social demands. *Id.*

The evidence does not support Plaintiff's contention that she suffered marked limitations due to mental impairments. Notwithstanding one suicidal attempt in December 2002 (within the relevant period) and one suicidal attempt in May 2004 (outside the relevant period), Plaintiff repeatedly denied suicidal thinking. *Id.* at 13-15, 204-11, 246-56. The ALJ included restrictions due to Plaintiff's reported mental impairments, including her testimony, treatment notes of her health care providers and the opinions of the state-agency psychologists. *Id.* at 12-15, 204-11, 246-56, 263-80, 284-301. Substantial evidence supports the ALJ's RFC determination for the period January 15, 2001, through December 31, 2003.

After evaluating Plaintiff's credibility and the material evidence of record, the ALJ incorporated into Plaintiff's RFC finding those impairments he found credible. *Id.* at 12-15. When posed with the ALJ's proposed findings in a hypothetical question, Mr. Bradley responded that such a person could perform the light, unskilled work of a housekeeper and dining-room attendant and the unskilled, sedentary work of surveillance systems monitor and laminator. *Id.* at 12. 16, 46-50; *see supra* at 34 n.7. The question was properly formulated, so the expert's testimony that Plaintiff could perform other work constitutes substantial evidence supporting the Commissioner's decision. *Id.*; Phillips, 357 F.3d at 1240.

## B. Plaintiff's Credibility

Plaintiff acknowledges that the ALJ articulated specific reasons for discounting the credibility of her allegations. R. 13-15; doc. 11 at 13-15. Plaintiff argues, however,

that these reasons are not supported by substantial evidence consistent with law.  Doc.

11 at 13-15.  Contrary to Plaintiff's argument, substantial evidence consistent with

controlling law, supports the ALJ's credibility analysis.

As discussed above, the medical evidence does not support Plaintiff's argument

that she was precluded from performing one of several representative sedentary jobs

prior to the expiration of the insured status on December 31, 2003.  *Id.* at 16.

The ALJ summarized Plaintiff's hearing testimony, *id.* at 14 and Plaintiff does not

contend that the ALJ overlooked material testimony.  *See* Doc. 11 at 13-16.

The ALJ found Plaintiff had severe impairments that "could reasonably be

expected to cause the alleged symptoms."  The ALJ, however, did not find her

"statements concerning the intensity, persistence and limiting effects of these

symptoms" to be credible "to the extent they are inconsistent with the" ALJ RFC

assessment, which is supported by substantial evidence.  R. 14.  The ALJ made several

observations and credibility findings in support of these conclusions.  *Id.* at 14-15.

The ALJ noted that Plaintiff's alleged onset date was January 15, 2001, yet

Plaintiff did not seek out any type of medical treatment until December of 2002, almost

two years later.  *Id.* 14-15.  Plaintiff last worked as a financial planner in March 2001

and was arrested in June 2001 and criminal charges were filed thereafter and lawsuits

ensued.  *Id.* at 13.  Plaintiff testified that she has been treated by Dr. Morgan who

prescribed medication prior to her first of two suicide attempts.  Plaintiff felt things

escalated and that she could not go on anymore by the time she was first examined and

treated by Dr. Munasifi in and around December 6, 2002.  *Id.* at 33-34, 231.

Plaintiff cites a Ninth Circuit case, Regennitter v. Commissioner of SSA, 166 F.3d 1294 (9th Cir. 1999), to criticize the rejection of mental impairments based on a lack of treatment.[8]  Doc. 11 at 14.  That criticism, expressed in two circuits, has not been an actual holding in either circuit.  Rather, it seems to be a logical understanding of the under-reported nature of mental illness.  A claimant's failure to seek mental health treatment is a proper factor for the ALJ to consider in assessing credibility.  Sheldon v. Astrue, 268 F. App'x 871, 872 (11th Cir. 2008) (unpublished) (citing Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (explaining that in addition to objective medical evidence, it is proper for ALJ to consider use of painkillers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); *see also* Carnley v. Astrue, No. 5:07cv155/RS/EMT, 2008 U.S. Dist. LEXIS 113930, at *27 (N.D. Fla. Aug. 21, 2008) (same).

Further, in Social Security Regulation (SSR) 96-7p, 1996 SSR LEXIS 4, the Social Security Administration provides policy interpretations regarding the adjudicators evaluation of a claimant's symptoms and credibility.  In part, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the

---

[8]  In Regennitter, the court noted that the record supported the claimant's "uncontested explanation for not seeking more treatment: he could not afford it.  [The claimant] had no income for many years."  Also, the claimant received regular treatment until his insurance ran out and he could "rarely afford prescription medication."  166 F.3d at 1296-97.  Plaintiff does not contend she could not afford medical treatment or that such was unavailable prior to her first visit with Dr. Munasifi in December 2002.

individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.  The explanations provided by the individual may provide insight into the individual's credibility.  *Id.* at *21-22.[9]  Although Plaintiff discussed the circumstances of her lawsuits and the criminal allegations in general, Plaintiff offered no concrete reasons for not seeking mental health treatment from January 2001 until December 2002, and the ALJ did not err in making this credibility finding.

Plaintiff also complains that the ALJ improperly discounted Plaintiff's subjective allegations based upon her "generally unpersuasive appearance and demeanor while testifying at the hearing."  Doc. 11 at 16.  The ALJ is entitled to analyze a claimant's credibility based upon the claimant's demeanor at the hearing.  *See* Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985) (explaining ALJ may also consider the claimant's "appearance and demeanor during the hearing" as a basis of credibility, although he cannot weigh it above objective medical evidence).  Contrary to Plaintiff's suggestion, the ALJ did not find "all of Plaintiff's allegations not credible."  Doc. 11 at 14.  The ALJ found that Plaintiff's subjective complaints were partly credible and he included numerous restrictions in the RFC assessment that accounted for moderate symptomology from mental impairments.  R. 12-15.  Substantial evidence supports the ALJ's findings regarding Plaintiff's demeanor.

---

[9]  The ALJ's mention of Plaintiff's lack of seeking medical treatment for almost two years after the alleged onset date bore on Plaintiff's credibility regarding "the intensity, persistence and limited effects of the symptoms" or impairments, not on whether her impairments were severe.

Plaintiff takes issue with the ALJ's determination that Plaintiff's "treatment since December of 2002 has been essentially routine and/or conservative in nature."  Doc. 11 at 15.[10]  The ALJ stated:

> The claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records revealed that the medications have been relatively effective in controlling the claimant symptoms when she takes them as prescribed.  Furthermore, the record shows that beginning in October of 2003, the claimant stopped taking all medication except for Xanax, which she only took on as needed basis.  Furthermore, the description of symptoms and limitations, which the claimant has provided throughout the record, it's generally been inconsistent and unpersuasive.

R. 15.

Plaintiff saw Dr. Munasifi on December 6, 10, and 18, 2002, and thereafter until May 7, 2003.  (Plaintiff was referred for hospitalization on December 30, 2002 and discharged after a one night stay.)  From December 10, 2002, through May 7, 2003, Plaintiff was also treated by Dr. Smith.

On her next visit with Dr. Munasifi on October 21, 2003, the doctor noted that Plaintiff is doing well, had some depression, but she stopped her medication except Xanax.  *Id.* at 256.  The stoppage of medication was also noted by Dr. Munasifi during a March 23, 2004, office visit when he suggested Plaintiff restart taking Lexapro with a gradual increase in dosage.  *Id.*

Plaintiff correctly notes that she had a relapse and was hospitalized in May 2004 for a second suicide attempt.  *Id.* at 195-98.  By August 30, 2004, however, Dr. Munasifi noted that Plaintiff was doing well, although she began to get depressed.  Zoloft did not work so she began using her old Prozac and after a few days she felt better.  Plaintiff

---

[10]  "A doctor's conservative medical treatment for a particular condition tends to negate a claim of disability.  *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir 1996)."  Sheldon, 268 F. App'x at 872.

was described as alert and oriented with memory intact, thinking okay, with a sad mood but not suicidal or dangerous to others.  *Id.* at 254.

Plaintiff was treated with medication and what appear to be therapy sessions throughout her visits with Dr. Munasifi.  Thus, substantial evidence supports the ALJ's findings that Plaintiff was treated in a routine and conservative manner.  Further, the ALJ's credibility findings are supported by substantial evidence based on a review of the record as a whole.  *See* Dyer v. Barnhart, 395 F.3d 1206, 1212 (11th Cir. 2005).

**VI.  Conclusion**

Considering the Record as a whole, the findings of the ALJ are based upon substantial evidence and the ALJ correctly applied the law.  Accordingly, the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED.**  The Clerk is **DIRECTED** to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on September 28, 2012.

<u>s/    **Charles A. Stampelos**</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**